UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES PHILLIP CLARK,

    Petitioner,                              Hon. Robert Holmes Bell

v.                                            Case No. 4:06-CV-32

BLAINE LAFLER,

    Respondent.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Clark's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Clark's petition be **denied**.

## BACKGROUND

As a result of events which occurred November 26, 2002, Petitioner was charged with first degree home invasion, assault with intent to do great bodily harm less than murder, and armed robbery. (Dkt. #13, Trial Transcript, August 12, 2003, 3-4). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**Donald Evans**

Evans testified that as of November 26, 2002, he was 72 years of age. (Dkt. #13, Trial Transcript, August 12, 2003, 85-86). As of that date, Evans resided in a house located at 30 Bradley Street in Battle Creek. (Tr. 86). Evans lived alone at the time. (Tr. 86-87).

On the evening of November 26, 2002, Evans returned home between 6:00 and 7:00 p.m. (Tr. 88). Evans went to bed at 9:00 p.m. that evening. (Tr. 96). A "little after" 11:00 p.m. Evans awoke after hearing "a crashing noise, a loud noise." (Tr. 96). When he awoke, Evans saw two men in his house, one white and the other black. (Tr. 96-97). The intruders began kicking Evans and striking him "in the face." (Tr. 96-98). The intruders told Evans that they would kill him unless he surrendered his car, his money, and bank account (ATM) information. (Tr. 97-99). Evans gave his money, car keys, and bank account information to the black intruder. (Tr. 98-100). The black man exited the house and departed in Evans' car. (Tr. 100). The white man then wrapped a cord around Evans' throat and told Evans that he was going to "choke [him] to death." (Tr. 98-100).

The black man eventually returned to Evans' residence, at which point the two intruders began speaking together in the kitchen. (Tr. 101). During this conversation, Evans heard one of the intruders speak the name "Phillip Sango." (Tr. 101). While the two intruders were in the kitchen, Evans attempted to escape by "ma[king] a break out the front door." (Tr. 101). The intruders captured Evans, however, and placed him in the bathroom closet. (Tr. 101). The intruders then departed. (Tr. 101).

The men that invaded Evans' home that night, stole Evans' car, ATM card, and watch. (Tr. 103-04). The intruders also stole beer from Evans' refrigerator. (Tr. 104). Evans suffered serious injuries to his left eye which required emergency surgery the following day. (Dkt.

#14, Trial Transcript, August 12, 2003, 3-6). Evans also suffered injuries to his knees, back, teeth, jaw, and hand. (Tr. 3). Evans was incapacitated for two months as a result of his injuries and was forced to move out of his house because he could no longer care for himself. (Tr. 16, 22). Evans identified Petitioner from a photographic lineup and later identified him from a corporeal lineup. (Tr. 16-19). At trial, Evans testified that he was "100 percent certain" that Petitioner was the "dirty bastard" that invaded his home that night and attempted to kill him. (Tr. 101-02).

**Stephanie Estree**

As of November 26, 2002, Estree was employed as a patrol officer with the Battle Creek Police Department. (Dkt. #15, Trial Transcript, August 13, 2003, 5-6). At approximately 11:30 p.m. that evening, Officer Estree was dispatched to Donald Evans' residence. (Tr. 6). When she arrived, Evans was "in the street." (Tr. 7-8). He was "severely injured" and "visibly shaken." (Tr. 8). An ambulance arrived soon thereafter and Evans was transported to the hospital. (Tr. 8-10).

**Robert Corbin**

As of November 26, 2002, Corbin was employed as a technician with the Battle Creek Police Department Mobile Crime Scene. (Dkt. #15, Trial Transcript, August 13, 2003, 18). Late that evening, Corbin was dispatched to a local hospital where he took photographs of Donald Evans' injuries. (Tr. 18-19). Officer Corbin then proceeded to Donald Evans' residence to "process" the crime scene. (Tr. 20).

**Michael Wood**

As of November 26, 2002, Wood was employed as a detective with the Battle Creek Police Department. (Dkt. #15, Trial Transcript, August 13, 2003, 30-31). Detective Wood was assigned to investigate the invasion of Donald Evans' home and his subsequent beating by the two intruders. (Tr. 31).

As part of his investigation, Detective Wood researched the name Phillip Sango and learned that the last known address for this individual was 21 Bradley Street, which was located only "50 to 75" yards away from Donald Evans' residence. (Tr. 33-34). Detective Wood also learned that 21 Bradley Street was the address of a man named Charles Clark. (Tr. 34). Detective Wood went to 21 Bradley Street, where he spoke with both Phillip Sango and Charles Clark. (Tr. 34-35).

Soon thereafter, Detective Wood conducted a photographic lineup with Donald Evans. (Tr. 36-39). Phillip Sango and Charles Clark were both included in the lineup. (Tr. 36-39). Evans did not select Sango from the lineup, but immediately identified Clark as "the guy who beat [him] up." (Tr. 36-39).

**Joel Case**

As of November 28, 2002, Case was employed as a police officer for the City of Battle Creek. (Dkt. #15, Trial Transcript, August 13, 2003, 55-56). On that date, Officer Case discovered Donald Evans' vehicle at 153 Hopkins Street. (Tr. 56-59). When he looked inside the car, Officer Case observed a wristwatch sitting on the dash and an empty beer bottle laying on the floor. (Tr. 60). Officer Case did not handle any of these objects, but instead requested that a crime scene technician be dispatched to the scene. (Tr. 60).

**Kevin Mahan**

Mahan testified that as of November 5, 2002, he was employed as a Corrections Officer at the Calhoun County Jail. (Dkt. #15, Trial Transcript, August 13, 2003, 67). Mahan testified that fingerprint cards are prepared in the ordinary course of his business. (Tr. 68). Mahan testified that when a fingerprint card is prepared, the name and date of birth of the person being fingerprinted is recorded and printed on the fingerprint card. (Tr. 68-69). Mahan testified that he knew Petitioner and that it was "possible" that he obtained Petitioner's fingerprints and prepared a fingerprint card on November 5, 2002. (Tr. 70-71). Mahan then identified a specific fingerprint card as bearing Petitioner's name and date of birth. (Tr. 72). This fingerprint card indicated that Petitioner had been fingerprinted on November 5, 2002. (Tr. 72). Mahan testified that it was customary for the person being fingerprinted to sign the fingerprint card. (Tr. 72-73). Mahan did not recall observing Petitioner sign his fingerprint card. (Tr. 73).

**Jennifer Diepenhorst**

As of November 28, 2002, Diepenhorst was employed as a Forensic Technician with the Battle Creek Police Department. (Dkt. #15, Trial Transcript, August 13, 2003, 75-80). On this date, Diepenhorst was dispatched to 153 Hopkins Street "to process a vehicle for evidence." (Tr. 80-81). Relying on the fingerprint card that Corrections Officer Mahan identified, Diepenhorst testified that forensic testing of the beer bottle recovered from Donald Evans' vehicle revealed the presence of Petitioner's fingerprints. (Tr. 81-89).

**Charles Clark**

Petitioner testified that as of November 26, 2002, he was living at 21 Bradley Street. (Dkt. #15, Trial Transcript, August 13, 2003, 107). Petitioner testified that Phillip Sango lived there as well. (Tr. 107). Petitioner testified that on the evening of November 26, 2002, he was at home watching television. (Tr. 108-09). According to Petitioner, Phillip Sango returned to the residence later that night requesting beer bottles that he could return for deposit. (Tr. 109). Petitioner testified that he placed several beer bottles into a bag for Sango, who then departed the residence. (Tr. 109-10). Petitioner testified that he did not participate in the crimes which occurred at Donald Evans' residence on November 26, 2002. (Tr. 106-15). Petitioner also testified that the fingerprint card, on which Crime Technician Diepenhorst's fingerprint identification was based, did not contain his signature. (Tr. 114-15).

On cross-examination, Petitioner acknowledged that on November 5, 2002, he was booked into jail and fingerprinted. (Tr. 115-17). When questioned about the events of November 26, 2002, Petitioner testified that Phillip Sango returned to their residence between 9:30 and 10:00 p.m. looking for beer bottles. (Tr. 118-19). Petitioner reiterated that he provided Sango with several beer bottles. (Tr. 120-21). Petitioner asserted that this is how a beer bottle with his fingerprints was found in Donald Evans' car. (Tr. 121-22). Petitioner acknowledged, however, that when he was questioned by the police about the events of November 26, 2002, that he did not inform police officers about this alleged encounter with Phillip Sango. (Tr. 122).

**William Howe**

Howe testified that as of May 28, 2003, he was employed as an investigator with the Calhoun County Prosecutor's Office. (Dkt. #15, Trial Transcript, August 13, 2003, 142-43). Howe testified that he was previously the supervisor of the Battle Creek Police Department Forensic Science Unit. (Tr. 143). Howe was recognized by the court as an expert in the field of fingerprint analysis and identification. (Tr. 143-44).

Howe testified that on May 28, 2003, he took a fingerprint of Petitioner's left index finger. (Tr. 144-47). Howe then compared this fingerprint to the left index fingerprint on the fingerprint card identified by Officer Mahan and relied upon by Jennifer Diepenhorst. (Tr. 146-48). Howe testified that the two fingerprints were an "identical match." (Tr. 148).

Following the presentation of evidence, the jury found Petitioner guilty of first degree home invasion, assault with intent to do great bodily harm less than murder, and armed robbery. (Dkt. #17, Trial Transcript, August 14, 2003, 35). In light of the fact that he had previously been convicted of five felonies (as well as 43 misdemeanors), Petitioner was sentenced to serve 20-40 years in prison on the home invasion conviction. (Dkt. #18, Sentencing Transcript, September 22, 2003, 3-9). Petitioner also received consecutive sentences of 9.5 to 40 years and 20 to 40 years on the assault and armed robbery convictions, respectively. (Tr. 9). Petitioner appealed his convictions to the Michigan Court of Appeals asserting the following claims:

> I.   Defendant's convictions should be reversed because there was insufficient evidence to find for the convictions of first degree home invasion and armed robbery.
>
> II.  Defendant is entitled to re-sentencing where the imposed sentences were based on inaccurate information which was not corrected and counsel was

                    ineffective for failing to challenge the inaccurate information.

    III.    Defendant was denied a fair and impartial trial when the prosecutor failed to correct prior inconsistent testimony of a prosecution key witness.

    IV.    The prosecution violated Defendant's due process by not producing crucial material evidence at the trial phase of prosecution.

    V.    The failure of trial counsel to exercise the skill, judgment and diligence of a reasonably competent attorney denied Defendant effective assistance of counsel.[1]

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Clark,* No. 251351, Opinion (Mich. Ct. App., Feb. 22, 2005). Asserting the following claims, Petitioner moved in the Michigan Supreme Court for leave to appeal:

    I.    Defendant's convictions should be reversed because there was insufficient evidence to find for the convictions of first degree home invasion and armed robbery.

    II.    The prosecution violated Defendant's due process rights by not producing crucial material at the trial phase of the prosecution.

    III.    Trial counsel failed to exercise the skill, judgment and diligence of a reasonably competent attorney, denying Defendant effective assistance of counsel.

The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Clark*, No. 128421, Order (Mich., Sept. 28, 2005). On April 3, 2006, Petitioner initiated the present action,

---

[1] Claims I and II were asserted by Petitioner's counsel. Claims III, IV, and V were asserted by Petitioner in a pro per supplemental brief.

asserting the following claims:

      I.      Ineffective assistance of counsel.

      II.      Prosecutorial misconduct.

      III.      Insufficient evidence for the charges of home invasion, armed robbery, and assault with the intent to commit great bodily harm less than murder.

      IV.      Judicial misconduct.[2]

## STANDARD OF REVIEW

Clark's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>     (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
>     (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the

---

[2] Petitioner subsequently dismissed claims III and IV from his petition. (Dkt. #32).

extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's]

10

precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

## **ANALYSIS**

**I.      Prosecutorial Misconduct**

Petitioner asserts that the prosecuting attorney engaged in misconduct, depriving him of his constitutional right to a fair trial. As the Sixth Circuit has stated, "[w]hen a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor.'" *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v.*

*Wainwright*, 477 U.S. 168, 181 (1986)).

Petitioner first asserts that the prosecutor improperly elicited "false and misleading" testimony from Donald Evans. This claim is based upon Petitioner's belief that the testimony Evans offered at his August 2003 trial was inconsistent with statements he made to the police as well as testimony he provided at a previous trial.[3] A review of the police reports submitted by Petitioner and the transcript of the testimony Evans offered at Petitioner's first trial, (dkt. #11), reveals no evidence of inconsistency in the statements Evans made to the police or in the testimony he offered at Petitioner's two trials.

Petitioner next asserts that the prosecutor unlawfully failed to provide him with the fingerprint "alleged to have been removed from a beer bottle" so that it could be "inspected or compared by the court or jury as evidence against the defendant." In a related argument, Petitioner also asserts that the prosecutor engaged in misconduct by eliciting testimony from Jennifer Diepenhorst and William Howe supporting the prosecution's position that Petitioner's fingerprint was recovered from a beer bottle found in Donald Evans' vehicle.

As to the first part of this argument, the Court notes that Petitioner has presented absolutely no evidence in support thereof. Petitioner has submitted no evidence that either the actual beer bottle in question or the results of any fingerprint analyses were not made available to Petitioner prior to trial. As to Petitioner's latter argument, the Court fails to discern error in the prosecutor's conduct of questioning Diepenhorst or Howe as to their actions or the results of their findings. To the extent that Petitioner believes that the jury should not have given their testimony any weight, the

---

[3] Petitioner was initially tried in May 2003, for crimes arising from the November 26, 2002 robbery and assault of Donald Evans. (Dkt. #9, 11-12). This proceeding ended in a mistrial. (Dkt. #9). It appears that the mistrial was based on the jury's inability to reach a unanimous verdict. (Dkt. #9).

Court notes that Petitioner was given the opportunity to cross-examine these witnesses.

The Michigan Court of Appeals concluded that Petitioner's prosecutorial misconduct claims were "without merit." *People v. Clark,* No. 251351, Opinion at 3 (Mich. Ct. App., Feb. 22, 2005). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

**II.        Ineffective Assistance of Counsel**

Petitioner asserts that his trial attorney was ineffective for failing to perform sufficient pre-trial investigation.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, Petitioner must demonstrate that his attorney's actions were unreasonable under prevailing professional norms. *Id.* at 688. In assessing such a claim, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable

13

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

Petitioner claims that his trial counsel was ineffective for failing to engage in sufficient pre-trial investigation to counter the fingerprint evidence presented by Jennifer Diepenhorst and William Howe. Petitioner also asserts that his attorney failed to interview the "prosecution's witnesses" prior to trial "as well as impeach them with prior inconsistent statements and testimony." Finally, Petitioner alleges that his counsel was ineffective for failing to investigate "potentially corroborating witnesses." Even if the Court assumes that Petitioner's counsel was ineffective for failing to undertake the aforementioned actions, Petitioner has presented absolutely no evidence demonstrating that he suffered prejudice resulting therefrom.

The Michigan Court of Appeals concluded that this claim was "without merit." *People v. Clark,* No. 251351, Opinion at 3 (Mich. Ct. App., Feb. 22, 2005). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Clark's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: June 22, 2009

/s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge